| | |
|---|---|
| ACE TREE SURGERY, INC., individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> TEREX CORPORATION, TEREX SOUTH DAKOTA, INC., and TEREX UTILITIES, INC., <br><br> Defendants. | CIVIL ACTION NO. <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br> July 22, 2015 <br><br> (JURY DEMAND) |

Plaintiff Ace Tree Surgery, Inc. ("Ace" or "Plaintiff"), individually and on behalf of all other similarly situated owners or lessees of vehicles equipped with a Terex Hi-Ranger XT Series Overcenter Aerial Device (the "Class," as more particularly defined below), by its undersigned counsel, brings this class action Complaint against Terex Corporation, Terex South Dakota, Inc., and Terex Utilities, Inc. (collectively "Terex" or "Defendants"), for claims arising under warranty laws and state unfair and deceptive trade practices acts, as well as for other related claims, seeking economic damages and injunctive relief. All allegations in this Complaint are based upon the investigation of counsel except the specific allegations pertaining to Ace, which are based on personal knowledge.

## I.     NATURE OF THE ACTION

1. An "aerial device," sometimes referred to as an "aerial work platform," is a mechanical device used to elevate workers or equipment to inaccessible areas, usually at heights exceeding dozens of feet. Aerial devices are often mounted onto vehicles such as commercial truck chassis. The combination of an aerial device and truck chassis is sometimes referred to as a "Cherry Picker" or "Bucket Truck."

2. The Terex Hi-Ranger XT Series ("Hi-Ranger XT") is a particular brand and model line of articulating overcenter aerial devices designed, manufactured, marketed, and sold by Terex between 1996 and the present.

3. All Hi-Ranger XTs are vehicle mounted. Hi-Ranger XTs have a platform load capacity of 350 pounds, working heights between 57 and 75 feet, and side reaches ranging between approximately 42 and 50 feet.

4. In order for a vehicle-mounted aerial device like the Hi-Ranger XT to be legally used, it must adhere to the standard for aerial devices promulgated by the American National Standards Institute as "ANSI A92.2 American National Standard for Vehicle Mounted Elevating and Rotating Work Platforms," ("ANSI A92.2"), which has in turn been adopted by the Occupational Safety and Health Administration ("OSHA") as a binding regulation. *See* 29 C.F.R. § 1910.67(b) and 29 C.F.R. § 1926.453; *see also* 29 C.F.R. 1910.6.

5. The ANSI A92.2 standard, at section 4 "Design Requirements" subsection 4.2 "Structural Safety Factors," requires that the steel structural elements of an aerial device have a calculated design stress that is not more than 50% of the minimum yield strength of the steel. Minimum yield strength is the amount of force that must be applied to permanently deform the steel. In simple terms, this means that all of the structural steel in the aerial device must be able to withstand twice the amount of force that normal and expected use of the aerial device would cause before the steel in the aerial device permanently deforms in any way. This structural safety factor can be referred to as a "two to one" or "2:1" safety factor.

6. The 2:1 safety factor is an important safety feature of aerial devices because deformation of a structural component of an aerial device can lead to catastrophic failure during use. Such catastrophic failures can cause serious injury or death to the user of the aerial device as

well as to bystanders from falls and impacts with equipment. As a matter of safety, given the ordinary use of bucket trucks, the manufacturer must design the device to keep the bucket occupant safe at heights as high as 75 feet when the boom is loaded dynamically and the truck is secured on an uneven surface.

7.     Given the importance of the ANSI A92.2 for both legal use and safety, Terex represents and warrants in a "Certificate of Conformity" provided with each and every Hi-Ranger XT that all Hi-Ranger XTs sold were "successfully tested and thoroughly inspected for conformance with . . . the applicable regulations of ANSI A92.2[]."

8.     However, Terex's representations of Hi-Ranger XT ANSI A92.2 conformance are false.

9.     As Terex should have known when it first began selling Hi-Ranger XTs in 1996, as Terex actually knew when it conducted strain gauge testing of several Hi-Ranger XTs in 2004 after it had received numerous reports of cracks in various locations on the boom components of those aerial devices, and as Ace learned after April 9, 2014, when one of the Hi-Ranger XTs it had purchased catastrophically failed, causing one of Ace's employees to fall from a height of approximately 30 feet and rendering that employee a paraplegic, the Hi-Ranger XT series of aerial devices fails to provide the required 2:1 safety factor, fails to comply with ANSI A92.2, cannot be legally used, and are not as Terex represented and warranted them to be.

10.     Hi-Ranger XT aerial devices fail to provide the 2:1 safety factor because of the way Terex designed them. Terex could have and should have designed the Hi-Ranger XTs such that the calculated design stresses in the boom components of the device did not exceed the 2:1 safety factor – whether by using alternative geometries for the boom components, by specifying

the use of steel with a greater minimum yield strength, or by other feasible engineering solutions – but Terex failed to do so.

11.     Despite Terex's knowledge that all of its Hi-Ranger XTs suffered from a common design defect that rendered those Hi-Ranger XTs unsafe, unfit for their ordinary purpose, effectively economically worthless, and non-compliant with Terex's representations, certifications, and warranties, Terex denied – and continues to deny – the existence of the design defect and refused – and continues to refuse – to take steps to remedy all of the defectively designed Hi-Ranger XTs and replace them with properly designed overcenter articulating aerial devices with structural components that meet the ANSI A92.2 required 2:1 safety factor.

12.     Accordingly, Ace brings this Complaint individually and on behalf of the other Class members asserting claims for breach of warranty and violation of state unfair and deceptive trade practices laws, as well as for other related claims, against Terex. Plaintiff, individually and on behalf of the other Class members, seeks economic damages – both for replacement of the Hi-Ranger XT itself and for damage to the vehicles to which the Hi-Ranger XTs are mounted – and injunctive relief.

## II.      PARTIES

13.     Plaintiff Ace Tree Surgery, Inc. is a Georgia corporation with its principal place of business in Marietta, Georgia. Ace purchased at least two new Hi-Ranger XTs from authorized Terex distributors on April 30, 2003 (Terex XT60/70 Serial Number 2021020554) and January 27, 2004 (Terex XT60/70 Serial Number 2030621804). In purchasing these Terex Hi-Ranger XTs, Ace reasonably relied on Terex's representation and certification that these aerial devices complied with ANSI A92.2 and were fit for their intended purpose for use as an aerial device. Ace further relied that Terex would honor the lifetime parts warranty Terex issued for the structural components, including specifically the steel and fiberglass booms, of the Hi-

Ranger XTs. Ace would not have purchased these Terex Hi-Ranger XTs if it had known that Terex's representations of ANSI A92.2 compliance were false, if it had known that Terex would fail to honor its warranty of ANSI A92.2 conformance, or if it had known that Terex would fail to honor its lifetime parts only warranty of the structural boom components.

14. Defendant Terex Corporation ("Terex Corporation") is a Delaware corporation with its principal place of business located in Westport, Connecticut. Terex Corporation's registered agent for service of process is Corporation Service Company, 50 Weston Road, Hartford, Connecticut, 06120. Terex Corporation describes itself as a lifting and material handling solutions company with five business segments, including aerial work platforms and utilities segments. Terex Corporation breached its contracts and warranties with Plaintiff and the other class members in Connecticut after failing to provide relief requested after demand was made upon Terex Corporation in Connecticut.

15. On information and belief, the Hi-Ranger XTs at issue in this Complaint are currently part of the Terex Corporation utilities segment while they were previously part of Terex's aerial work platforms segment.

16. On April 7, 1997, Terex Corporation completed the acquisition of certain of the former subsidiaries of Simon Engineering plc including "Simon Telelect, Inc." Terex Corporation renamed Simon Telelect, Inc. as Terex Telelect, Inc. or Terex-Telelect, Inc.

17. Defendant Terex South Dakota, Inc. ("Terex South Dakota") is a Delaware Corporation with manufacturing facilities located in Watertown, South Dakota. On information and belief, Terex South Dakota is a wholly owned subsidiary of Terex Corporation, and Terex Corporation exercises full authority and control over the actions of Terex South Dakota. Terex

South Dakota designed, assembled, manufactured, inspected, and tested the Hi-Ranger XTs at its facilities in South Dakota.

18.     Defendant Terex Utilities, Inc. ("Terex Utilities") is an Oregon Corporation with facilities in Tigard, Oregon.  On information and belief, Terex Utilities is a wholly owned subsidiary of Terex Corporation, and Terex Corporation exercises full authority and control over the actions of Terex Utilities.  Terex Utilities is involved in the sale, development, and marketing of Hi-Ranger XTs throughout the nation.

19.     On information and belief, Terex Corporation, Terex South Dakota, and/or Terex Utilities are the successors of, and responsible for the liabilities of, Simon Telelect, Inc., Terex Telelect, Inc., and Terex-Telelect, Inc.

### III.     JURISDICTION AND VENUE

20.     This Court has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).  Plaintiff is a citizen of Georgia that purchased Hi-Ranger XTs in Georgia from authorized Terex distributors located in Virginia. Class members are citizens of all states and purchased their Hi-Ranger XTs across the country from authorized Terex distributors across the country, or from Terex Corporation (or one of Terex Corporation's subsidiaries) directly.  Pursuant to 28 U.S.C. §§ 1332(c) and (d)(10), Defendants are corporations organized under the laws of Delaware and/or Oregon, with their principal places of business in Connecticut.  As a result, the named Plaintiff, Class members, and the Defendants are citizens of different states within the meaning of 28 U.S.C. § 1332(d)(2)(A).

21.     All Defendants have sufficient minimum contacts with this district as Terex Corporation is headquartered in this district and, on information and belief, exercises authority and control and further directs the activities of its wholly owned subsidiaries Terex South Dakota and Terex Utilities from this district. Terex Corporation is registered to do business and be

served with process upon its registered agent in this district.  Thus, this Court may properly exercise personal jurisdiction over all Defendants.

22.     On information and belief, Terex manufactured and sold (both directly and indirectly) thousands of Terex Hi-Ranger XTs to thousands of members of the proposed Class for tens of thousands of dollars each.  Thus, the proposed Class membership exceeds thousands of entities and persons and, pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class members' claims substantially exceeds $5,000,000, satisfying the requisite amount in controversy set forth in 28 U.S.C. § 1332(d)(2).  Additionally, the "local controversy exception" and "home state exception" to jurisdiction under 28 U.S.C. § 1332(d)(2), as set forth under 28 U.S.C. § 1332(d)(4)(A) and (B), do not apply here.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (2) and (3) on the grounds that a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district and on the grounds that all defendants are subject to personal jurisdiction in this district, and as such, are deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)(2).

## IV.     FACTUAL ALLEGATIONS

### A.     General Description of The Hi-Ranger XT Model Line

24.     The Hi-Ranger XT model line is a series of vehicle-mounted elevating and rotating aerial devices.

25.     Terex (through its predecessor Simon-Telelect) introduced the first model within the Hi-Ranger XT series line – the Hi-Ranger XT52 – in 1996.

26.     Over the next several years Terex introduced three additional models within the Hi-Ranger XT model line: the XT55, the XT58, and the XT60 (sometimes, Terex referred to these Hi-Ranger XTs as the XT52/62, XT55/65, XT58/68, and XT60/70 to reflect Terex's

introduction of an optional 10-foot "transverse lift" installed between the turntable and the truck chassis that provides users with additional working height).

27. All Hi-Ranger XTs consist of several components. Workers stand in a "platform" (sometimes referred to as a "bucket") that is secured to the "boom tip" at the end of an "upper boom." The upper boom is attached to a "lower boom" at an "upper boom pivot" or "elbow." The lower boom is then connected at the "lower boom pivot" to a "turntable" that sits on a "rotation bearing" mounted on top of a "pedestal." The pedestal is mounted onto the truck chassis along with outriggers and control boxes.

28. The upper and lower boom sections are raised and lowered by a series of three hydraulic cylinders that cause the booms to rotate about the upper boom and lower boom pivots.

29. The lower boom is extended and retracted by a single hydraulic "lower boom lift cylinder" that is connected to the turntable and the lower boom.

30. The upper boom is articulated by the combined operation of two hydraulic cylinders – the "lower elbow cylinder" and the "upper elbow cylinder" – that connect to the lower and upper booms respectively as well as to another component called the "elbow link Tri-Link" which, in addition to attaching to the two elbow cylinders, is also attached to the upper boom pivot.

31. An illustrated diagram of the components of a Hi-Ranger XT as mounted on a generic truck chassis follows below:


//remainder of page intentionally blank//

## NOMENCLATURE



32.    The only physical differences among the four models of Hi-Ranger XTs pertains to their abilities to elevate to different heights, extend to different side reaches, and have their lower booms extended to a slightly different angle over center.

33.    Each progressively higher numbered Hi-Ranger XT can reach progressively higher heights because it has longer boom lengths. Furthermore, the maximum angle of extension that the upper and lower booms of each Hi-Ranger XT model number can reach varies.

34.     With the lower boom lift cylinder fully retracted, the lower boom is horizontal in all Hi-Ranger XT models.

35.     As the lower boom cylinder extends to full extension, the lower boom rotates to a raised position of 135° for the XT52, 125° for the XT55, and 120° for the XT58 and XT60.

36.     As noted above, the upper boom is controlled by the extension of the two elbow cylinders by Terex's patented "Tri-Link" at the elbow, and when these cylinders are operated, the upper boom articulates 270° for the XT52, 260° for the XT55, and 245° for the XT58 and XT60 relative to the lower boom.

37.     Other than the differences in boom lengths and degree of rotation/articulation, all of the individual models of Hi-Ranger XTs are substantially the same.

38.     Particularly, the engineering and design of the portions of the upper and lower booms to which the hydraulic cylinders are attached are all the same.

**B.      ANSI's Aerial Device Design Requirements Applicable to All Hi-Ranger XTs**

39.     As the designer, manufacturer, marketer, and seller of Hi-Ranger XTs, Terex is responsible for ensuring that Hi-Ranger XTs have designs that are safe and that meet the requisite industry standards for vehicle mounted elevating and rotating aerial devices, including particularly ANSI A92.2's requirements regarding calculated design stresses.

40.     In the early 1900s, a number of engineering societies and government agencies came together to form the American Engineering Standards Committee ("AESC").

41.     The AESC's primary purpose was to coordinate the development of uniform safety standards for industrial products to prevent workplace injuries. The AESC underwent several periods of reorganization with accompanying name changes, but eventually adopted the title of American National Standards Institute ("ANSI") in 1969.

42.     In 1969, ANSI promulgated the first standards for aerial devices, like the Hi-Ranger XTs at issue in this litigation, as the "ANSI A92.2-1969 American National Standard for Vehicle-Mounted Elevating and Rotating Work Platforms," ("ANSI A92.9-1969") sponsored by the American Mutual Insurance Alliance and the American Society of Safety Engineers, and approved by ANSI on November 3, 1969.

43.     The ANSI A92.2-1969 standards "are to be considered as minimum requirements."

44.     Section 4 of ANSI A92.2-1969 pertains to the "Design and Manufacture" of aerial devices.

45.     Subsection 4.1 of ANSI A92.2-1969 sets forth "Basic Principles" as follows: "Sound engineering principles and reasonable assumptions consistent with all data available regarding use and environment shall be applied in the design of aerial devices, with due respect for the unit's being personnel-carrying equipment."

46.     Subsection 4.2 of ANSI A92.2-1969 sets forth a "Structural Safety Factor" as follows: "The basic structural elements of the aerial device which support the platform shall be designed so that the yield point of the material used for any such elements shall not be exceeded by three times the rated loads on the aerial device. The same structural safety factor shall apply to the platform."

47.     The "yield point," also referred to as a "yield strength" or the "minimum yield strength," is defined in engineering and materials science as the stress at which a material begins to deform "plastically," that is, non-reversibly; reversible deformations are referred to as "elastic" deformations.

48.     Over the following decades, in consultation with several organizations with an interest in the safety of aerial devices, such as unions, insurers, manufacturers' trade groups (primarily, the Scaffolding Industry Association ("SIA")), and manufacturers themselves (including current Terex subsidiaries), ANSI revised the A92.2 standard several times, including in 1979, 1990, 2001, and 2009.

49.     The ANSI A92.2-1990, "American National Standard for Vehicle-Mounted Elevating and Rotating Aerial Devices" ("ANSI A92.2-1990") was in force at the time Terex designed and began manufacturing Hi-Ranger XTs.

50.     Like ANSI A92.2-1969, ANSI A92.2-1990 also sets forth "Basic Principles" and a "Structural Safety Factor" in section 4, "Design and Manufacture," of the standard.

51.     Subsection 4.2 of ANSI A92.2-1990 sets forth a "Structural Safety Factor" as follows:

> Structural elements of the aerial device which support the platform, the platform itself, and material carrying attachments, if so equipped, shall have a design stress as stated herein.  The calculated design stress shall be based on the combined rated load and weight of the support structure.
>
> **For ductile materials having a minimum elongation of 10% in 2 inches the design stress shall not be more than 50% of the minimum yield strength of the material**.
>
> For non-ductile material . . . .[1]
>
> The analysis shall consider the effects of stress concentration and dynamic loading and operation on a 5 degree slope.
>
> The analysis shall consider loads produced during travel and mobile operation.

---

[1] "Ductility" is a solid material's ability to deform under tensile stress; generally, pulling on a ductile material with sufficient force will cause that material to stretch and elongate, while pulling on a non-ductile material with that same force may result in either no deformation at all or in fracture of the material through cracking, breaking, or shattering.  With greater applications of tensile stress, ductile material will eventually fracture as well.

ANSI A92.2-1990 § 4.2 (emphasis added).

52.     By this language, ANSI changed the structural safety factor from 3:1 in the 1969

standard to 2:1 in the 1990 standard.

53.     The ANSI A92.2-2001 § 4.2 maintained the 2:1 structural safety factor, stating in

subsection 4.2 of the standard as follows:

> Structural elements of the aerial device which support the platform, the platform itself, and material carrying attachments, if so equipped, shall have a design stress as stated herein.  The calculated design stress shall be based on the combined rated load and weight of the support structure.
>
> **For ductile materials, the design stress shall not be more than 50% of the minimum yield strength of the material.**
>
> For brittle material(s) . . .
>
> The analysis shall consider the effects of stress concentration and dynamic loading and operation on a 5 degree slope. The analysis shall also consider the effects of ambient temperature in the temperature range for which the manufacturer has designed the aerial device. The analysis shall consider loads produced during travel and mobile operation.

ANSI A92.2-2001 § 4.2 (emphasis added).

54.     The current revision of ANSI A92.2-2009 also maintains the 2:1 structural safety

factor, stating in subsection 4.2 of the standard as follows:

> Structural elements of the aerial device which support the platform, the platform itself, and material carrying attachments, if so equipped, shall have a design stress as stated herein.  The calculated design stress shall be based on the combined rated load capacity and weight of the support structure.
>
> **For ductile materials, the design stress shall not be more than 50% of minimum yield strength of the material.**
>
> For non-ductile material(s) . . .
>
> The analysis shall consider the effects of the following:
>
> - Stress concentrations
> - Dynamic loadings

- Operation on a 5 degree slope
- Ambient temperatures for which the aerial device has been designed.
- Loads produced during travel or mobile operations.
- Loads produced from wind.
- Loads produced from manual forces applied at the upper periphery of the platform (Minimum value shall be 50 pounds applied horizontally for aerial devices designed to carry one person and 100 pounds applied horizontally for aerial devices designed to carry more than one person.)
- Loads that include column loading (Maximum load on any column at the rated load capacity of the aerial device in any position shall not exceed 50% of the load that would cause deformation.)

ANSI A92.2-2009 §4.2 (emphasis added).

55.     The ANSI A92.2 standards have been adopted by the Occupational Safety and Health Administration ("OSHA") as binding regulations. *See* 29 C.F.R. § 1910.67(b) ("Unless otherwise provided in this section, aerial devices (aerial lifts) acquired on or after July 1, 1975, shall be designed and constructed in conformance with the applicable requirements of the American National Standard for 'Vehicle Mounted Elevating and Rotating Work Platforms,' ANSI A92.2 – 1969, including appendix, which is incorporated by reference as specified in § 1910.6. Aerial lifts acquired for use before July 1, 1975 which do not meet the requirements of ANSI A92.2 – 1969, may not be used after July 1, 1976, unless they shall have been modified so as to conform with the applicable design and construction requirements of ANSI A92.2 – 1969."); 29 C.F.R. § 1926.453 ("Unless otherwise provided in this section, aerial lifts acquired for use on or after January 22, 1973 shall be designed and constructed in conformance with the applicable requirements of the American National Standards for 'Vehicle Mounted Elevating and Rotating Work Platforms,' ANSI A92.2-1969, including appendix. Aerial lifts acquired before January 22, 1973 which do not meet the requirements of ANSI A92.2-1969, may not be used after January 1, 1976, unless they shall have been modified so as to conform with the applicable design and construction requirements of ANSI A92.2-1969."); 29 C.F.R. § 1910.6 ("The

standards of . . . organizations which are not agencies of the U.S. Government which are incorporated by reference in this Part, have the same force and effect as other standards in this Part." 29 C.F.R. §1910.67(a)(1).").

56.     Compliance with a revised version of ANSI A92.2 is sufficient to satisfy compliance with the 1969 version of ANSI A92.2 explicitly listed in the Code of Federal Regulations.  *See* OSHA Interpretation Letter dated Nov. 8, 2005 to John J. Brewington (interpreting code of federal regulations to mean that revised ANSI A92.2 standards provide employee protection equivalent to the parts of ANSI A92.2-1969 explicitly incorporated into the code, and noting that "vehicle-mounted elevating and rotating aerial devices that meet the requirements of either ANSI A92.2-1979 or ANSI A92.2-1990, §4.1 need not also meet ANSI A92.2-1969, §4.1 because OSHA determined in the Subpart L rulemaking that these revised consensus standards provide protection equivalent to that of ANSI A92.2-1969, §4.1.").

57.     Thus, in order for a vehicle-mounted aerial device to be legally used, it must at least adhere to the current 2:1 structural safety factor standard for aerial devices promulgated by ANSI in ANSI A92.2 § 4.2 and adopted by OSHA.

**C.     The ANSI A92.2 2:1 Structural Safety Factor Applies to the Entirety of the Upper and Lower Boom Components of All Hi-Ranger XTs**

58.     The entirety of the upper and lower booms of Hi-Ranger XTs are structural elements of the aerial device which support the platform.

59.     The upper and lower booms of the Hi-Ranger XTs are made from steel that is a ductile material having a minimum elongation of at least 10% in 2 inches.

60.     Thus, the 2:1 structural safety factor set forth in subsection 4.2 of ANSI A92.2 applies to the steel in the entirety of the upper and lower boom components of all Hi-Ranger XTs.

**D.** **The Calculated Design Stresses in Critical Areas of Hi-Ranger XTs Exceeds the ANSI A92.2 2:1 Structural Safety Factor**

61.     In its maintenance manual for Hi-Ranger XTs, Terex specifies several critical welds that are crucial to the structural integrity of the device; these critical welds are all located where one component of the Hi-Ranger XT attaches to another component of the Hi-Ranger XT.

62.     It is at these locations that the stresses on the materials used to make the device are generally at their highest because it is at these locations where stress concentrates.

63.     A diagram of the critical welds in Hi-Ranger XTs follows below. In that diagram, Terex fails to include or identify three critical welds that contain some of the highest stress areas in the entirety of the Hi-Ranger XT; three areas in which Terex has seen numerous and repeated instances of cracking.

//remainder of page intentionally blank//



## CRITICAL WELDS

Verify the structural integrity of the aerial lift. Certain structural components or areas of the aerial lift are termed critical. These items should be inspected for signs of fatigue or impending failure. Any suspect item should be further inspected using an acceptable non−destructive test procedure such as magnetic particle or dye penetrant. Repair or replace defective items found.

Inspect all pivot points (cylinders, booms, turntable assembly, boom tip assembly). Check welds at all boss locations, weldment assemblies which pivot, and side plates (turntable weldment, elbow weldment).

CRITICAL WELDS

103−9
308564 01/01

64.     When Terex first introduced the XT52 model of Hi-Ranger XTs in 1996, Terex specified in the design drawings that the boom tubes (upper and lower) would be manufactured using steel with minimum yield strength of 55,000 pounds per square inch ("psi").

65. Terex attempted to verify that its design of and specifications for Hi-Ranger XTs were safe and in compliance with ANSI structural safety factor through limited and insufficient testing.

66. Specifically, Terex used simplified hand calculations and load-testing-to-failure instead of other and more relevant stress-strain analytical techniques, such as computer modeling for finite element analysis, strain gauge testing, brittle lacquer testing, or photoelastic testing.

67. Finite Element Analysis ("FEA") is a well-established mathematical modeling technique that mechanical engineers can use to predict the stresses and strains occurring in materials and structures. Typically, the input analysis for an FEA stress analysis are a geometrical description of the structure, the properties of the material used for the parts, how the parts are joined, and the maximum or typical forces that are expected to be applied to each point of the structure. Once this data is input, a mechanical engineering software package will calculate and output the stresses and strains across the structure. This output can be represented as visual color gradient or as a quantified measure of stress at specific locations along the structure.

68. Strain gauge testing is a well-accepted experimental technique (as opposed to a modeling technique) where a device generally consisting of an insulated flexible backing supporting a metallic foil pattern (called a "strain gauge") is attached to the exterior of a structure, electrical current is run through the strain gauge, and then forces are applied to the structure causing deformations in the structure and in the strain gauge metallic foil pattern, which in turn causes changes in the electrical resistance of the strain gauge that can be measured. These measured changes in electrical resistance can then be used to infer the amount of stress within the structure resulting from the loading forces.

69.    Brittle lacquer testing is another well-accepted experimental technique in which a coating of brittle lacquer is coated onto the surface of a structure and allowed to cure.  After the brittle lacquer coating cures, it becomes strain sensitive.  Force is then applied to the structure and strain patterns in the lacquer can be observed, allowing inference of stress within the structure resulting from the loading forces.  This technique locates critically stressed areas and visually presents principal strain directions, as well as information on the strain gradients – all of which are useful for the proper selection, location and orientation of strain gauges for accurate measurement of peak stresses.  Brittle lacquer tests are a well-known and widely accepted non-destructive testing method that have been used for years to provide test engineers with quick, reliable, graphical information about the strain response of the material to which the lacquer is bonded.

70.    Photoelastic testing is yet another technique for measuring stresses within a structure that relies on the fact that some materials exhibit birefringence (on optical property of a material having a refractive index responsible for the phenomenon of double refraction whereby a ray of light, when incident upon a birefringent material, is split by polarization into two rays taking slightly different paths; for example, the rainbow like patterns that appear in stressed plastics like cellophane are an example birefringence) on the application of stress, and on the fact that the magnitude of the refractive indices at each point in the material is directly related to the state of stress at that point. The stresses in a structure can be determined by making a model of the structure from such a photoelastic material, subjecting it to load, and observing and measuring the refractions.

71.    Terex's original design for the XT52 with 55,000 psi minimum yield strength steel failed to provide the required 2:1 safety factor by an extremely wide margin, as the forces

concentrating in some critical areas of the boom well exceeded 22,500 psi in certain static and dynamic conditions.

72.    On May 4, 1999, Terex changed the design drawing specification for the steel to be used to manufacture the boom tubes of Hi-Ranger XTs from 55,000psi minimum yield strength steel to 70,000psi minimum yield strength steel.

73.    Terex's change in material specification, however, was insufficient to solve the problems with its Hi-Ranger XT line.

74.    Between 1999 and 2004, Terex received reports of cracking in the boom components of its Hi-Ranger XTs.

75.    As a result of these report of cracking in Hi-Ranger XTs manufactured with the stronger 70,000 psi minimum yield strength steel, Terex retained an outside consultant in January 2004 to conduct brittle lacquer and strain gauge tests on an XT55 model Hi-Ranger XT.

76.    The outside consultant's strain gauge tests revealed, contrary to Terex's hand calculations, that Hi-Ranger XTs experienced stresses in critical areas of the upper and lower booms that exceeded the 2:1 safety factor (that is, the measured stress was greater than 35,000psi, which is 50% of the minimum yield strength of the steel specified and used by Terex for the manufacture of Hi-Ranger XTs after 1999).

77.    Terex attempted to "rework" the design of XT55s because of the results of the January 2004 tests to improve the structural integrity of all Hi-Ranger XTs.  This rework consisted of a "field fix" for XT55s already manufactured and a "production fix" for XT55s still to be manufactured.

78.    In February 2004, Terex again retained the same outside consultant to test the "reworked" XT55s; however, the outside consultant's strain gauge tests revealed that both the

"field fix" and "production fix" XT55s *still* experienced stresses in critical areas of the upper and lower booms that exceeded the 2:1 safety factor (that is, the measured stress was greater than 35,000psi, which is 50% of the minimum yield strength of the steel specified and used by Terex for the manufacture of Hi-Ranger XTs).

79.     On or about March 29, 2004, Terex changed the design of its Hi-Ranger XTs to that of the "production fix," despite the fact that the design stress in critical areas of the upper and lower boom still exceeded the 2:1 safety factor in that design.

80.     Even after the February 2004 production fix, Terex continued to receive reports of cracking in Hi-Ranger XTs.

81.     Terex attempted to remedy these cracks by selling "fix kits" for Hi-Ranger XTs; however, on information and belief, these fix kits do not remedy the underlying failure to provide the required 2:1 safety factor.  Instead, the fix kits merely patch an area along the boom where a crack has already occurred.  In essence, the fix kit is nothing more than a Band-Aid for an external cut caused by a broken bone when a cast is actually required to fix the underlying injury.

82.     The occurrence of cracks in Hi-Ranger XTs indicates that the design of Hi-Ranger XTs fails to provide the 2:1 safety factor and that, in normal use, the stresses on the areas that have cracked exceed the minimum yield strength to such an extent that, in addition to permanent plastic deformation, actual fractures of the steel occur as well.

83.     On or about April 9, 2014, a Hi-Ranger XT60/70 owned by Plaintiff Ace catastrophically failed at a high stress area (specifically, on the lower boom around the connection to the lower boom cylinder at a part referred to by Terex as the "WELDT, LB STUB, RA MOUNT," or Part No. 452714) while being operated by one of Ace's employees, Jeffrey

Gaddy, causing Mr. Gaddy to fall approximately 30 feet and to suffer a spinal injury that has rendered him a paraplegic.

84. Mr. Gaddy has brought a personal injury suit against Terex and others currently pending in the Northern District of Georgia (*Gaddy v. Terex Corp. et al.*, Case No. 1:14-cv-01928-WSD).

85. Upon information and belief, a Finite Element Analysis can be conducted on the design of Hi-Ranger XTs, including on the specific geometry of an XT52 (Terex's lightest Hi-Ranger XT) as well as on the specific geometry of an XT60 (Terex's heaviest Hi-Ranger XT) based on Terex's pre-2004 and post-2004 design drawings.

86. Upon information and belief, Finite Element Analysis can confirm, entirely from common evidence, that the common design of all Hi-Ranger XTs is incapable of providing the 2:1 structural safety factor required by ANSI A92.2 because it will output predicted stresses exceeding 35,000psi, which is more than 50% of the minimum yield strength of the steel specified for manufacture of Hi-Ranger XTs, at the location in which the Hi-Ranger XT Mr. Gaddy was operating catastrophically failed.

87. Taken together, the 2004 strain gauge testing and the proposed Finite Element Analysis can show at least six points in three separate areas at which stresses in Hi-Ranger XTs exceed the 2:1 safety factor. These three areas are circled in the diagram of a generic Hi-Ranger XT produced below, with the area that catastrophically failed on the device operated by Mr. Gaddy on April 9, 2014 circled in red:

//remainder of page intentionally blank//



88.     At all points in time, and across all individual models of Hi-Ranger XTs, Terex's
Hi-Ranger XTs do not provide owners of those aerial devices with the required 2:1 safety factor
due to their common defective design.

89.     As a result, all Hi-Ranger XTs may not be legally used pursuant to OSHA
regulations and are extremely dangerous to their operators as well as to bystanders.

90.     Despite this danger to life and limb, Terex has failed to recall all Hi-Ranger XTs
and refuses to acknowledge this serious safety defect.

**B.      Terex's False Representations and of Hi-Ranger XT ANSI A92.2 Compliance**

91.      Terex marketed and sold Hi-Ranger XTs to Class members both directly and through a network of authorized dealers.

92.      Upon information and belief, Terex and its authorized dealers agreed at all relevant times that the authorized dealers would act on behalf of Terex in the sale and marketing of the Hi-Ranger XTs.

93.      Upon information and belief, Terex had and continues to have actual authority over the authorized dealers respecting the sale and marketing of the Hi-Ranger XTs to customers, including Class members.

94.      Terex exercised that authority by, among other things, establishing the manner in which authorized dealers must market the Hi-Rangers XTs to customers.  Such exercise of control over authorized dealers included, but is not limited to, providing standardized written marketing materials, spec sheets, and other information regarding the Hi-Ranger XTs, and directing authorized dealers to use such information when marketing and selling the Hi-Ranger XTs to Class members.

95.      Upon information and belief, in exercise of the authority granted to them by, and at the direction of Terex, authorized dealers relied upon such information when they marketed and sold the Hi-Ranger XTs to Class members, including in the course of making false representations of the Hi-Ranger XTs' compliance with ANSI A92.2 and suitability for use as aerial device, as detailed herein.

96.      In addition, Terex further represents and certifies (and thereby warrants) that all Hi-Ranger XTs comply with ANSI A92.2 in Certificates of Conformity, product manuals, and in metal placards directly affixed by Terex to every Hi-Ranger XT.

97.     In a Certificate of Conformity that accompanies each and every Hi-Ranger XT, an

example of which is attached hereto as **Exhibit A**, Terex states and thereby warrants as follows:

> **This is to certify that the Terex Telelect Inc. unit designated above has been successfully tested and thoroughly inspected for conformance with** the Terex Telelect Inc. specifications applicable to this model, for conformance with all details of the acknowledgment for the unit, and with **applicable regulations of ANSI A 92.2-2001 as of the date shown**.  All mechanical and electrical tests have been performed at Terex Telelect Inc.
>
> Detailed test data for this unit is available from Terex Telect Inc. upon request.

(emphasis added).

98.     Terex also makes these representations of ANSI A92.2 compliance in two

different manuals provided with every Hi-Ranger XT: the Terex Telelect Hi-Ranger XT Series

OPERATOR'S MANUAL at pages vi-vii ("Safety Guidelines . . . Aerial Device has been tested

per the stability requirements of ANSI A92.2 and may be operated on firm, non-level surfaces up

to a 4-degree slope.") and at page A-1 in Appendix A ("In addition to the operational instructions

provided herein, various standards and governmental regulations must be followed in the use and

operation of your TEREX TELELECT unit. **ANSI STANDARDS** ANSI standards that are

applicable to the operation and maintenance of your unit:  ANSI A92.2 (latest revision) Vehicle

Mounted Elevating and Rotating Aerial Devices…") as well as in the Terex Telelect Hi-Ranger

XT Maintenance Manual at page A-1 in Appendix A (same).



//remainder of page intentionally blank//

99.    Terex also makes these representations of ANSI A92.2 compliance in a metal placard affixed to every Hi-Ranger XT:



100.    These representations are false and misleading.

101.    As explained in detail above, Hi-Ranger XTs do not provide the ANSI A92.2 § 4.2 required 2:1 structural safety factor due to the way in which they were all designed.

102.    Hi-Ranger XTs are unreasonably dangerous, unsuitable for their ordinary use and, as a result of the design defect identified herein that renders all Hi-Ranger XTs in non-conformance with applicable ANSI and OSHA standards, and hence unusable going forward, are now economically worthless as anything other than scrap metal unless and until an engineering solution that creates the required 2:1 safety factor is implemented.

103.   No reasonable person or entity would purchase a vehicle equipped with a Hi-Ranger XT had they known that it was non-compliant with the OSHA-adopted ANSI A92.2 structural safety standard because they would not be able to legally use it.

**C.   Terex's Refusal to Honor its Lifetime Parts Only Warranty By Refusing to Replace All Hi-Ranger XTs With ANSI A92.2 Compliant Structural Components**

104.   In addition to certifying (and thereby warranting) Hi-Ranger XTs' compliance with ANSI A92.2, Terex makes additional warranties for all Hi-Ranger XTs in a separate "TEREX-TELELECT WARRANTY" for "All Products" attached hereto as **Exhibit B**.

105.   That warranty includes a lifetime parts only warranty on structural components, such as the upper and lower booms of all Hi-Ranger XTs, as follows:

> The following structural members have a **LIFETIME** parts only warranty for the original owner after date of shipment from TEREX–TELELECT: Sub frame, Pedestal, Turntable, Steel and Fiberglass Booms. The **LIFETIME** warranty requires an annual service inspection by an authorized TEREX–TELELECT distributor and all replacement parts to be original equipment parts from TEREX–TELELECT. The above listed components shall have a FIVE (5) YEAR parts only warranty if the annual service inspection is performed by an approved entity other than an authorized TEREX–TELELECT distributor. All replacement parts are to be original equipment parts from TEREX–TELELECT.

(emphasis in original).

106.   Terex's attempt to limit or otherwise restrict the applicability of its lifetime parts only warranty or its certification of conformance with ANSI A92.2 standards through annual service inspection requirements, disclaimers, limitations of liability, or disavowal of the warranty of merchantability and fitness for a particular purpose are void as unconscionable given the design defects impacting user and bystander safety as alleged herein.

107.   On July 10, 2015, Plaintiff provided notice, individually and on behalf of all others similarly situated, by letter sent to Terex in Connecticut attached hereto as **Exhibit C**, of the non-conformance of the structural components of all Hi-Ranger XTs with Terex's lifetime

parts only warranty as well as Terex's alleged breach of state unfair and deceptive trade practices acts.

108.    Plaintiff's notice was provided within a reasonable time after discovery of the breach of warranty caused by the defective design of the structural components of Hi-Ranger XTs.

109.    Following receipt of Plaintiff's notice of breach, given both individually and on behalf of all the other members of the proposed Class, Terex refused to honor its warranty for all class members in the manner requested.  Instead, Terex rejected all assertions and demands set forth in the pre-suit notice and demanded production of written reports substantiating the allegations of fact asserted herein.  Terex's response to Plaintiff's pre-suit notice is attached hereto as **Exhibit D**.

110.    Terex's refusal to honor its warranty, and corresponding breach, occurred in Connecticut.

## V.    TOLLING

111.    Because the failure of the Hi-Ranger XTs to provide the 2:1 safety factor is undetectable without specialized mechanical engineering analysis of the boom components – whether through finite element analysis, strain gauge testing, brittle lacquer testing, photoelasticity analysis, or otherwise – Plaintiff and the other Class members were not and still are not reasonably able to discover the defect on their own.

112.    More importantly, Terex not only failed to disclose the Hi-Ranger XTs' Defects but also failed to warn Plaintiff and the other Class members of them.

113.    Instead, Terex took steps to actively conceal the inherently defective engineering of the Hi-Ranger XTs by secreting the results of the 2004 strain gauge tests and continuing to represent and warrant Hi-Ranger XTs as ANSI A92.2 compliant.

114.    As a result, any and all applicable statutes of limitation have been tolled by

Terex's concealment of the true facts alleged herein, and Terex is equitably estopped from

relying upon any statutes of limitation because of their concealment of the defective nature of the

Hi-Ranger XTs.

## VI.    CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action as a Class Action pursuant to Rules 23(a), 23(b)(2) and

23(b)(3) of the Federal Rules of Civil Procedure.  This action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority provisions of Rule 23.

116.    The Class is defined as follows:

**Nationwide Class**

All persons and entities in the United States who purchased, not for
resale, or leased a vehicle equipped with a Terex Hi-Ranger XT in
the United States.

Excluded from the Class are Defendants, their agents, affiliates, and employees, the Judge

assigned to this matter, and any member of the Judge's staff and immediate family.

117.    In addition to the Nationwide Class defined above, should choice-of law analysis

require application of law other than that of the forum state for any particular claim, Plaintiff

seeks certification of separate state subclasses for such claims.  For example, the Georgia state

subclass is defined as:

**Georgia Subclass**

All persons and entities who purchased, not for resale, or leased a
vehicle equipped with a Terex Hi-Ranger XT that reside in the
state of Georgia.

Excluded from the State Subclasses are Defendants, their agents, affiliates, and employees, the

Judge assigned to this matter, and any member of the Judge's staff and immediate family.

118.   The Nationwide Class and the State Subclasses are referred to collectively herein as the "Class" unless otherwise indicated.

119.   Claims for personal injury are specifically excluded from the Class definitions.

120.   ***Numerosity.***   The requirements of Rule 23(a)(1) are satisfied in that there are too many Class members for joinder of all of them to be practicable.   On information and belief, the Class includes over one thousand members.   This Class, as defined above, meets the numerosity requirement.

121.   ***Commonality.***   The claims of the Class members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2).   These common legal and factual questions—the answers to which will drive resolution of the litigation—may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, including, but not limited to, the following questions:

*Questions of Fact*

(a)   Whether the Hi-Ranger XTs are defectively designed and/or manufactured such that they are not suitable for their intended use because they fail to provide the required 2:1 structural safety factor.

(b)   Whether the Hi-Ranger XTs are prone to cracking and can suddenly and dangerously fail.

(c)   Whether the Terex knew or should have known of the inherent design defect of the Hi-Ranger XTs.

(d)   Whether Terex fraudulently concealed from and/or failed to disclose to Plaintiff and the other Class members that the Hi-Ranger XTs were inherently defective and dangerous and unsuitable for use as an aerial device.

(e)     Whether Terex failed to adequately warn Plaintiff and the other Class members of the inherent defects and dangers posed by the Hi-Ranger XTs.

(f)     Whether the Terex is unable to properly repair the Defect, such that Terex failed to honor its lifetime parts only warranty obligations as to the steel boom components of the Hi-Ranger XTs.

(g)     Whether Plaintiff and the other Class members were in fact injured by purchasing a vehicle that contains a Hi-Ranger XT that does not meet the quality standard represented and warranted by Defendants and required by OSHA regulations.

(h)     The amount by which Plaintiff and the other Class members have been economically injured.

    *Questions of Law*

(a)     Whether Defendants have breached express and implied warranties.

(b)     Whether Defendants have voided limitations on their warranties because such limitations are unconscionable under the circumstances.

(c)     Whether Defendants have voided limitations on their warranties through their conduct.

(d)     Whether Defendants' conduct in manufacturing, marketing, and selling the Hi-Ranger XTs constitutes a violation of the Connecticut Unfair Trade Practices Act, the Georgia Uniform Unfair and Deceptive Trade Practices Act, the South Dakota Unfair Trade Practices Act, or any other similar state statute applicable to the parties and conduct alleged herein.

(e)     Whether Defendants' conduct in selling aerial devices they knew to be defective, and their conduct in failing to inform purchasers of vehicles equipped with these aerial devices, constitutes a violation of other states' unfair and deceptive trade practices acts.

(f)     Whether Defendants engaged in unfair or deceptive acts or practices when they concealed the inherent defective conditions and dangers of the Hi-Ranger XTs and failed to warn Plaintiff and the other Class members of same.

(g)     Whether Defendants should be enjoined from further sales of Hi-Ranger XTs and compelled to recall them.

(h)     The categories and types of economic damages to which Plaintiff and the other Class members are entitled as a result of Defendant's actions as alleged herein.

122.     ***Typicality.***  Plaintiff's claims are typical of the other Class members' claims because they have a common factual source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3).  For example, the named Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members were injured or damaged by the same wrongful practices in which the Defendants engaged, namely the design, manufacture and sale of the inherently defective and dangerous Hi-Ranger XTs, the intentional concealment of the Defect, and the Defendants' inability to repair the Defect.

123.     ***Adequacy of Representation.***  The requirements of Rule 23(a)(4) are satisfied in that Plaintiff has a sufficient stake in the litigation to prosecute its claims vigorously on behalf of the other Class members, and Plaintiff's interests are aligned with the other Class members' interests.  There are no defenses of a unique nature that may be asserted against Plaintiff individually, as distinguished from defenses that may be asserted against all Class members, and the relief Plaintiff seeks is common to the Class.  Plaintiff has no interest that is in conflict with or is antagonistic to the interests of the other Class members, and Plaintiff has no conflict with any other Class member.  Plaintiff has retained competent counsel experienced in class action

litigation, including product defect and, specifically, vehicle defect class actions, to represent it and the other Class members in this litigation.

124. **_Predominance._** The Rule 23(b)(3) predominance requirement is satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, Plaintiff, like each of the other Class members, has suffered a common cause of injury, namely the defective design of the Hi-Ranger XTs that causes all such aerial devices to fail to provide the required 2:1 safety factor. Plaintiff asserts the same legal claims and seeks the same forms of relief to which the other Class members are entitled. Thus, common issues predominate over any individual issues.

125. **_Superiority_.** Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of Class members' claims is economically infeasible and procedurally impracticable. The expense of individual Class members prosecuting separate claims is large, and even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Individual litigation would also present the potential for varying, inconsistent, or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, it is desirable to concentrate litigation in this forum. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class is proper.

126. **_Declaratory and/or Injunctive Relief Under 23(b)(2)_.** Terex has acted, or refused to act, on grounds generally applicable to Plaintiff and other Class members, making

final injunctive relief or corresponding declaratory relief with respect to the proposed Class appropriate.

**VII.   CLAIMS FOR RELIEF**

**COUNT I**<br>**BREACH OF EXPRESS WARRANTY**<br>**(On Behalf of Plaintiff and the Nationwide Class against all Defendants)**

127.   Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

128.   Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

129.   Terex warrants that every Hi-Ranger XT "has been successfully tested and thoroughly inspected for conformance with the Terex Telelect Inc. specifications applicable to this model, for conformance with all details of the acknowledgment for the unit, and with applicable regulations of ANSI A 92.2-2001 as of the date shown." *See* Exhibit A.

130.   Terex further issues a lifetime warranty of the structural components of every Hi-Ranger XT.  *See* Exhibit B.

131.   As an express warrantor and manufacturer and merchant, Terex had obligations to conform the Hi-Ranger XTs to its express warranties.

132.   The Defect at issue in this litigation was present at the time of sale or lease of the Hi-Ranger XTs to Plaintiff and the other Class members.

133.   Terex breached its express warranties (and continues to breach those express warranties) because it did not (and does not) properly repair the defective structural components in Plaintiff's and the other Class members' Hi-Ranger XTs.  Terex further breached these express warranties when it sells a fix kit that patches a cracked upper or lower boom or when it replaces one Hi-Ranger XT upper or lower boom with another as all Hi-ranger XTs fail to

provide and are incapable of providing the required 2:1 structural safety factor due to their common design.

134.    Pursuant to the express warranties, Terex is obligated to pay for or reimburse Plaintiff and the other Class members for costs incurred in replacing the defective Hi-Ranger XTs.

135.    Pursuant to the express warranties, Terex is also obligated to properly remedy the failure to provide the required and warranted 2:1 structural safety factor in Hi-Ranger XTs.

136.    Terex and its authorized distributors have failed and refused to conform the Hi-Ranger XTs to the express warranties and Terex's conduct, as discussed throughout this Complaint, voided the limitations on liability contained in its lifetime parts warranty.

137.    Plaintiff and each of the other Class members used their Hi-Ranger XTs in a manner consistent with their intended use and have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Terex or by operation of law in light of Terex's unconscionable conduct described throughout this Complaint.

138.    Terex had actual knowledge of, and/or received timely notice regarding, the breaches of warranty at issue in this litigation and, notwithstanding such knowledge and notice, failed and refused to offer an effective remedy.

139.    In addition, Terex has received, on information and belief, hundreds of complaints and other notices from customers advising them of cracks in Hi-Ranger XT structural components.

140.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Terex to limit its express warranties in a manner that would exclude or limit

coverage for the failure to provide the required 2:1 safety factor, where such failure was present as of the time of sale or lease, which Terex knew or should have known about prior to offering the Hi-Ranger XTs for sale, which Terex concealed and did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the defect at issue is null and void.

141.    Accordingly, Plaintiff and the other Class members suffered damages caused by Terex's breaches of the express warranties and are entitled to recover damages as set forth herein.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of Plaintiff and the Nationwide Class against All Defendants)

142.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

143.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

144.    Terex is and was at all relevant times a merchant with respect to the Hi-Ranger XTs.  At all times relevant hereto, applicable law imposed a duty that requires that the Hi-Ranger XTs be fit for the ordinary purposes for which aerial devices are used and that they pass without objection in trade for their description.

145.    Terex has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffective.

146.    The Hi-Ranger XTs were defective at the time they left the possession of Terex as set forth above.  Terex knew or should have known of the defect at the time these transactions

occurred.  Thus, Hi-Ranger XTs, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

147.    By virtue of the conduct described herein and throughout this Complaint, Terex breached the implied warranty of merchantability.

148.    Plaintiff and the other Class members have used their Hi-Ranger XTs in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by Terex's conduct or by operation of law in light of Terex's unconscionable conduct.

149.    Terex had actual knowledge of, and received timely notice regarding, the failure of the Hi-Ranger XTs to provide the required 2:1 structural safety factor at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

150.    In addition, Terex has received, on information and belief, hundreds of complaints and other notices from customers advising of cracks in the boom components of Hi-Ranger XTs.

151.    Plaintiff has had sufficient direct dealings with Terex or its authorized dealers to establish any required privity of contract.  Notwithstanding this, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of warranties and certifications issued by Terex; specifically, they are intended beneficiaries of Terex's Certificate of Conformance attached as Exhibit A hereto and Warranty attached as Exhibit B hereto.  The distributors of vehicles equipped with Hi-Ranger XTs were not intended to be the ultimate consumers of the Hi-Ranger XTs and have no rights under the certifications and warranties provided with the Hi-Ranger XTs.  The certification and warranty agreements were designed for and intended to benefit the ultimate purchasers and lessees only.

152. As a direct and proximate result of Terex's breach of warranties, Plaintiff and the other Class members suffered economic damage, including loss attributable to the diminished value of their vehicles equipped with Hi-Ranger XTs, loss of use, as well as the monies spent and to be spent to repair and/or replace their Hi-Ranger XTs.

**COUNT III**
**BREACH OF IMPLIED COVENANT OF GOOD**
**FAITH AND FAIR DEALING**
**(On Behalf of Plaintiff and the Nationwide Class against All Defendants)**

153. Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

154. Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

155. Plaintiff and the other Class members entered into agreements to purchase vehicles equipped with Hi-Ranger XTs with Terex or its subsidiaries or authorized dealers or otherwise were in contractual privity with Terex as a result of the express warranties described herein.

156. The contracts and warranties were subject to the implied covenant that Terex would conduct business with Plaintiff and the other Class members in good faith and would deal fairly with them.

157. Terex breached those implied covenants by failing to disclose that any repair, fix kit, or replacement of defective parts in Plaintiff's and the other Class members' Hi-Ranger XTs would not cure the underlying failure of those devices to provide the represented and required 2:1 structural safety factor.

158. Any limitation on the implied covenant of good faith and fair dealing asserted by Terex as a result of the language of its express warranty is unconscionable under the circumstances described herein.

159. As a direct and proximate result of Terex's breach of its implied covenants, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
**(On Behalf of Plaintiff and the Nationwide Class against All Defendants)**

160. Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

161. Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

162. Terex manufactured, distributed, and sold to Class members Hi-Ranger XTs that it knew or should have known failed to conform with the OSHA required ANSI A92.2 § 4.2 2:1 structural safety factor.

163. Regardless of this knowledge, Terex explicitly represented that its Hi-Ranger XTs were manufactured in accordance with ANSI A92.2, successfully tested and thoroughly tested for conformance with the applicable regulations of ANSI A92.2, and actually conformed with the applicable regulations of ANSI A92.2 in Certificates of Conformance issued with each Hi-Ranger XT as well as in other Hi-Ranger XT operator and maintenance manuals.

164. Terex's representations were false.

165. Terex has no reasonable grounds for believing these representations to be true.

166. Terex made these representations with the intention that Plaintiff and the other Class members rely upon them.

167.     Terex made these representations to induce Plaintiff and the other Class members to enter into a business transaction: the purchase of their vehicles equipped with a Hi-Ranger XT.

168.     Plaintiff and Class members justifiably relied on the Terex's representations in deciding to purchase Hi-Ranger XTs for use, as the Code of Federal Regulations forbids use of aerial devices that do not comply with the applicable ANSI A92.2 standard.

169.     Plaintiff and Class members were harmed by Terex's misrepresentations regarding Hi-Ranger XT ANSI A92.2 compliance and are entitled to damages as a result in an amount to be proven at trial.

### COUNT V
### NEGLIGENT MISREPRESENTATION
### (On Behalf of Plaintiff and the Nationwide Class against All Defendants)

170.     Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

171.     Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

172.     Terex manufactured, distributed, and sold to Class members Hi-Ranger XTs that they knew or should have known contained an inherently dangerous or defective condition.

173.     Terex continued to manufacture, distribute, and sell to Class members the Hi-Ranger XTs after receiving substantial complaints of systematic product cracking due to the dangerous or defective condition.

174.     Terex did not disclose this dangerous or defective condition to consumers, and the condition was not easily discoverable by consumers.

175.     Terex omitted this information to induce Plaintiff and Class members to enter into a business transaction: the purchase of their vehicles containing the Engines.

176. Plaintiff and Class members justifiably relied on the Terex's omission in that they paid more for the Hi-Ranger XTs than they would have been worth had Terex disclosed the defective condition, or they would have purchased different aerial devices altogether.

177. Plaintiff and Class members were harmed by Terex's misrepresentations regarding the dangerous and defective condition of the Hi-Ranger XTs and are entitled to damages as a result in an amount to be proven at trial.

## COUNT VI
## FRAUDULENT CONCEALMENT
**(On Behalf of Plaintiff and the Nationwide Class against All Defendants)**

178. Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

179. Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

180. Terex made false representations about the Hi-Ranger XTs when they certified that Hi-Ranger XTs conformed with ANSI A92.2.

181. Additionally, Terex omitted an existing fact about the Hi-Ranger XTs when they failed to disclose information regarding the Hi-Ranger XT's dangerous and defective condition: failure to provide the required 2:1 structural safety factor.

182. The false representations and omissions are material because the defective condition poses a serious safety issue to owners of vehicles equipped with Hi-Ranger XTs and to the public.

183. Terex manufactured, distributed, and sold the Hi-Ranger XTs despite having knowledge of their defective and dangerous condition.

184. Terex intended that purchasers and lessees would rely on their representations and omissions regarding safety, reliability, and conformance with applicable ANSI standards, including ANSI A92.2, to enable sales of Hi-Ranger XTs.

185. Plaintiff and the other Class members were not aware of the defective condition and could not reasonably have discovered the defective condition.

186. Plaintiff and the other Class members relied on Terex's representations and omissions in that they paid more for the Hi-Ranger XTs than they would have been worth had Terex not misrepresented or disclosed the defective condition, or they would have purchased different aerial devices altogether.

187. Plaintiff and the other Class members had the right to rely on the Terex's representations and omissions that created the false impression that the Hi-Ranger XTs were safe and reliable based on reasonable consumer expectations that the Hi-Ranger XTs would not be designed such that they fail to adhere to ANSI A92.2 design standards and present unreasonably dangerous risk of catastrophic failure during use.

188. Terex has an affirmative duty to disclose the defective condition of the Hi-Ranger XTs to purchasers and lessees because Terex is were in a superior position to know the true state of the defectively designed Hi-Ranger XTs. Terex knew of the defective and dangerous design at least by 2004, and the defective and dangerous design was not easily discoverable by consumers. Terex breached their duty by failing to disclose the condition.

189. Terex fraudulently concealed the defective design of Hi-Ranger XTs, causing damages to Plaintiff and the other Class members in the form of replacement and other costs, and other damages to be proved at trial.

## COUNT VII
## UNJUST ENRICHMENT / RESTITUTION
### (On Behalf of Plaintiff and the Nationwide Class against All Defendants)

190.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

191.    This equitable claim is pleaded in the alternative to Plaintiff and the other Class members' legal claims.

192.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

193.    Plaintiff and the other Class members conferred a benefit on Terex, by purchasing Hi-Ranger XTs, causing profits to inure to Terex, but Terex misrepresented and failed to disclose their knowledge that Plaintiff did not receive what they paid for and misled Plaintiff and the other Class members regarding the qualities of the design of the Hi-Ranger XTs, while profiting from this deception.

194.    It would be inequitable, unconscionable, and unjust to permit Terex to retain the benefit of these profits that they unfairly obtained from Plaintiff and the other Class members.

195.    Plaintiff and the other Class members, having been injured by Terex's conduct, are entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Terex to the detriment of Plaintiff and the other Class members.

## COUNT VIII
## VIOLATIONS OF CONNECTICUT'S UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. §§ 42-110a *ET SEQ.*,
### (On Behalf of Plaintiff and the Nationwide Class against All Defendants)

196.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

197.     Plaintiff brings this claim individually and on behalf of the Nationwide Class against all Defendants.

198.     The Connecticut Unfair Trade Practices Act, Con. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA"), prohibits any person from engaging in unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce.

199.     Defendants designing, selling, marketing, and warranting of Hi-Ranger XTs is the conduct of trade or commerce.

200.     Terex engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce by falsely representing that Hi-Ranger XTs conformed with ANSI A92.2, designing Hi-Ranger XTs such that they failed to provide the required 2:1 safety factor, failing to remedy the defect in Hi-Ranger XTs when such defect was brought to Terex's attention, and failing to honor its ANSI A92.2 conformance and lifetime parts warranties.

201.     Terex's design, marketing, and sales of Hi-Ranger XTs are intimately associated with Connecticut.

202.     Furthermore, Plaintiff and the Nationwide Class were injured when Terex Corporation engaged in the unfair and deceptive trade practices of denying the existence of the failure of the Hi-Ranger XTs to conform to ANSI A92.2 as a result of a design defect and thereafter refusing to honor the lifetime parts warranty on Hi-Ranger XT structural components in Connecticut.

203.     Thus, Plaintiff and the Nationwide Class' injuries were caused by unfair trade practices committed by the Defendants in the state of Connecticut.

204.    Defendants' failures related to the design defect in the Hi-Ranger XTs that caused those aerial devices to fail to exhibit the required 2:1 safety factor have caused Plaintiff and the other members of the National Class to sustain ascertainable losses in the form of loss of value in and further use of their Hi-Ranger XTs.

205.    Due to Terex's use or employment of unfair or deceptive acts and practices in the conduct of trade and commerce as alleged herein, Plaintiff and the Nationwide Class are entitled to recover their actual damages, and the Court should further award punitive damages and such other equitable relief as the Court deems necessary and proper pursuant to CUTPA.

### COUNT IX
### VIOLATIONS OF SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW, S.D. CODIFIED LAWS §§ 37-24-1, *ET SEQ.*,
### (On Behalf of Plaintiff and the Nationwide Class against Defendant Terex South Dakota)

206.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

207.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against defendant Terex South Dakota.

208.    The South Dakota Deceptive Trade Practices and Consumer Protection Law is codified at S.D. Codified Laws §§ 37-24-1, *et seq.*

209.    Plaintiff and the other Class members are "persons" under the statute.

210.    Hi-Ranger XTs are "merchandise" under the statute.

211.    Terex South Dakota is engaged in trade and commerce, as those terms are defined under the statute, with respect to the marketing and sale of Hi-Ranger XTs.

212.    Terex South Dakota's trade and commerce with respect to the marketing and sale of Hi-Ranger XTs directly and indirectly affects the people of South Dakota.

213. Terex South Dakota acted, used, and employed deceptive acts or practices, fraud, false pretense, false promises, and misrepresentations of material fact in connection with the sale and advertisement of Hi-Ranger XTs, specifically by representing Hi-Ranger XTs conform to the requirements of ANSI A92.2, when, in fact, they do not because they fail to provide the required 2:1 structural safety factor.

214. Terex South Dakota's actions have adversely affected Plaintiff and the other Class members by causing them to pay more for Hi-Ranger XTs than they otherwise would have, or to have purchased them at all, and have further adversely affected Plaintiff and the other Class members through loss of use of aerial devices that are in violation of OSHA regulations and hence, cannot be legally used.

215. Plaintiff and the other Class members, having been injured by Terex South Dakota's conduct, are entitled damages as a result in an amount to be proven at trial.

**COUNT X**
**VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**O.C.G.A. § 10-1-370, *ET SEQ.*,**
**(On Behalf of Plaintiff and the Georgia Subclass against All Defendants)**

216. Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

217. Plaintiff brings this claim individually and on behalf of the Georgia Subclass against all Defendants.

218. The Georgia Uniform Deceptive Trade Practices Act is codified Official Code of Georgia Annotated § 10-1-370, *et seq.*

219. Georgia's Uniform Deceptive Trade Practices Act defines a deceptive trade practice to include, among other things, the following:

a. "Represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have," Ga. Code Ann. § 10-1-372(a)(5); and

b. "Represent[ing] that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another," Ga. Code Ann. § 10-1-372(a)(7).

220.    Terex's conduct, as set forth herein, constitutes unfair or deceptive acts or practices under the Uniform Deceptive Trade Practices Act, including, but not limited to Terex's manufacture and sale of aerial devices that failed to comply with applicable ANSI A92.2 requirements, including specifically the 2:1 structural safety factor, as well as Terex's failure to adequately investigate, disclose, and remedy, and its misrepresentations and omissions regarding the safety and reliability of its Hi-Ranger XTs.

221.    Terex's actions as set forth above occurred in the conduct of trade or commerce.

222.    Terex's actions impact the public interest because Plaintiff was injured in exactly the same way as hundreds of others purchasing and/or leasing vehicles equipped with Hi-Ranger XTs as a result of Terex's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Terex's business.

223.    Plaintiff and the other Georgia Subclass members were injured as a result of Terex's conduct.  Plaintiff and the other Georgia Subclass members overpaid for their defective vehicles equipped with a Hi-Ranger XT and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  Further, Plaintiff and the other Georgia Subclass

members suffered loss of use of their vehicles equipped with Hi-Ranger XTs due to their non-compliance with OSHA regulations.

224.     As a result of Terex's conduct as alleged herein, an injunction should be entered requiring Terex to stop the unlawful, unfair, and deceptive conduct alleged herein and/or requiring Terex to recall and/or replace all of the Hi-Ranger XTs installed in Plaintiff and the other Georgia Subclass members' vehicles.

225.     Furthermore, a judgment should be entered against Terex for Plaintiff and the Georgia Subclass members' actual damages resulting from the conduct alleged herein.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class and Subclass members, demands judgment against Terex Corporation, Terex Utilities, Inc., and Terex South Dakota, Inc. on each Count of the Complaint and requests that the Court:

a.     Issue an Order certifying the Class and/or any Subclasses the Court deems appropriate, appointing Plaintiff and its counsel as Class Counsel, and directing that reasonable notice of this action be given by Terex to all Class and Subclass members;

b.     Grant any reasonable request to amend this Complaint to conform to the discovery and evidence obtained in this Class Action;

c.     Empanel a jury to try this matter;

d.     Award to Plaintiff and the other Class members all compensatory damages provided for and consistent with their claims for relief;

e.     Award to Plaintiff and the other Class members all damages and equitable relief that the Court deems appropriate;

f.     Award to Plaintiff and the other Class members all exemplary and/or punitive damages allowed by law that the Court deems appropriate;

g.      Issue an injunction against the continued marketing and sale of all defectively designed Terex Hi-Ranger XTs;

h.      Compel Terex to initiate a manufacturer recall of all defectively designed Terex Hi-Ranger XTs;

i.      Grant Plaintiff and the other Class members their reasonable attorneys' fees and costs under any applicable fee shifting statutes;

j.      Award Plaintiff the costs and expenses it incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

k.      Award pre-and post-judgment interest as allowed by law; and

l.      Grant Plaintiff and the other Class members such further relief as the Court may deem just and proper.

## IX.   JURY DEMAND

226.   Plaintiff demands a trial by jury on all claims so triable.

Dated: July 22, 2015

Respectfully submitted,

/s/ Kathleen L. Nastri

Kathleen L. Nastri
**KOSKOFF, KOSKOFF & BIEDER, PC**
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Federal Bar Number: ct01074
Tel: (203) 336-4421
Fax: (203) 368-3244
knastri@koskoff.com

W. Daniel Miles, III (*pro hac vice application to be submitted*)
Archie I. Grubb (*pro hac vice application to be submitted*)
Andrew Brashier (*pro hac vice application to be submitted*)
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC**

P.O. Box 4160
Montgomery, Alabama  36103
Tel: (334) 269-2343
Fax: (334) 954-7555
Dee.Miles@BeasleyAllen.com
Archie.Grubb@BeasleyAllen.com
Andrew.Brashier@BeasleyAllen.com

Adam J. Levitt (*pro hac vice application to be submitted*)
Edmund S. Aronowitz (*pro hac vice application to be submitted*)
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Tel: (312) 214-0000
Fax: (312) 214-0001
alevitt@gelaw.com
earonowitz@gelaw.com

***Counsel for Plaintiff and the Proposed Class***

# Exhibit A

# CERTIFICATE OF CONFORMITY

Terex Telelect Inc. Model No. _____XT5_____  Serial No. _____2021020554_____

Distributor / Customer Name _____FEVA_____  P.O. No. _____L5068_____

Terex Telelect Inc. Ack. No. _____DK20554_____  Ack. Date _____9/6/02_____

Test Date _____10/4/02_____

Electrical Certification Test has been performed on this unit for the Qualification Voltage stated:

Qualification Voltage _____46KVAC_____  Design Voltage _____230KVAC_____

This unit is a Category "A" _____ "B" _____ "C" ____X____ Aerial Device.

Unit Equipped with One Bucket/Platform ____X____  Two Buckets/Platform _____

Platform Capacity _____350_____ pounds (Per Bucket or Platform)

Combined Platform Capacity _____350_____ pounds (Per Both Buckets or Platforms)

Platform Height __60-70__ feet    System Pressure __2750__ PSI

Electrical System Voltage:    12V __X__    24V _____

Unit equipped with material handling attachment:    Yes _____    No ___X___

*(See the unit Load Chart for material handling capacities and boom positions.)*

    This is to certify that the Terex Telelect Inc. unit designated above has been successfully tested and thoroughly inspected for conformance with the Terex Telelect Inc. specifications applicable to this model, for conformance with all details of the acknowledgment for the unit, and with applicable regulations of ANSI A92.2-2001 as of the date shown. All mechanical and electrical tests have been performed at Terex Telelect Inc.

    Detailed test data for this unit is available from Terex Telelect Inc. upon request.

    It is the responsibility of the final-stage manufacturer to certify that the entire vehicle or installation conforms to all applicable standards.

------------------------------------------------------------------------------------------------------------------

*(The Following To Be Completed by Installer)*

This unit was installed by:_____

    _____

    _____

Form #A2120C 08/02

# Exhibit B

# TEREX–TELELECT WARRANTY
## All Products

TEREX–TELELECT, INC. ("TEREX–TELELECT") hereby warrants all equipment manufactured and supplied by TEREX–TELELECT to be free from defects in material and workmanship at the time of shipment from the TEREX–TELELECT plant.  TEREX–TELELECT will repair or replace, at TEREX–TELELECT's sole option, at its plant any equipment which shall, within **TWELVE (12) MONTHS** after delivery to the original customer, but not to exceed **EIGHTEEN (18) MONTHS** from date of shipment from TEREX–TELELECT, be returned to TEREX–TELELECT's plant and be found by TEREX–TELELECT to have been defective at the time of original shipment from TEREX–TELELECT.

The following structural members have a **LIFETIME** parts only warranty for the original owner after date of shipment from TEREX–TELELECT: Sub frame, Pedestal, Turntable, Steel and Fiberglass Booms. The **LIFETIME** warranty requires an annual service inspection by an authorized TEREX–TELELECT distributor and all replacement parts to be original equipment parts from TEREX–TELELECT. The above listed components shall have a **FIVE (5) YEAR** parts only warranty if the annual service inspection is performed by an approved entity other than an authorized TEREX–TELELECT distributor. All replacement parts are to be original equipment parts from TEREX–TELELECT.
(Excludes fiberglass jibs, seals, gaskets and exterior coatings.)

**DISCLAIMER:** THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND IS ALSO IN LIEU OF ANY OTHER OBLIGATIONS ON THE PART OF TEREX–TELELECT. No agent, employee or representative of TEREX–TELELECT is authorized to bind TEREX–TELELECT to any other warranty.
This Warranty shall not apply with respect to any claimed defect which in TEREX–TELELECT's sole judgment has arisen from repair or alteration or from damage during shipment, accident, negligence, overloading, or misuse, including, but not limited to, operator's failure to follow any of the instructions issued with the equipment.

**LIMITATION OF LIABILITY:**  TEREX–TELELECT'S LIABILITY FOR ANY LOSSES AND DAMAGES RESULTING FROM ANY CAUSE WHATSOEVER, INCLUDING WITHOUT LIMITATION TEREX–TELELECT'S NEGLIGENCE OR FROM DAMAGED OR DEFECTIVE EQUIPMENT, IRRESPECTIVE OF WHETHER SUCH DEFECTS ARE DISCOVERABLE OR LATENT, SHALL IN NO EVENT EXCEED THE PURCHASE PRICE OF THE PARTICULAR EQUIPMENT TO WHICH LOSSES OR DAMAGES ARE CLAIMED, OR, AT THE ELECTION OF TEREX–TELELECT, THE REPAIR OR REPLACEMENT OF THE DEFECTIVE OR DAMAGED EQUIPMENT.
IN NO EVENT SHALL TEREX–TELELECT BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING WITHOUT LIMITATION COMMERCIAL LOSSES OR COSTS OF ANY KIND OR FOR ANY DAMAGES FOR WHICH BUYER MAY BE LIABLE TO OTHER PERSONS.

There are no express or implied warranties, including the WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, covering components, parts or accessories manufactured by someone else other than TEREX–TELELECT. Such warranties as may be furnished to TEREX–TELELECT by the manufacturer of such items will be extended to buyer by TEREX–TELELECT.

TEREX–TELELECT reserves the right to make changes in design or construction of its equipment at any time without obligating itself to make such changes on equipment previously manufactured.

In the event any provision of the warranty is for any reason held ineffective, the remaining provisions shall remain in full force and effect.

# Exhibit C



**Grant & Eisenhofer P.A.**

123 Justison Street
Wilmington, DE 19801
Tel: 302·622·7000
Fax: 302·622·7100

30 N. LaSalle Street, Suite 1200   Chicago, IL 60602   Tel: 312·214·0000   Fax: 312·214·0001

485 Lexington Avenue
New York, NY 10017
Tel: 646·722·8500
Fax: 646·722·8501

Adam J. Levitt
Director
Tel: 312·610·5400
alevitt@gelaw.com

July 10, 2015

1747 Pennsylvania Avenue, N.W., Suite 875
Washington, DC 20006
Tel: 202·386·9500
Fax: 202·386·9505

**BY OVERNIGHT COURIER**

Eric I. Cohen, Esq.
Senior Vice President, Secretary & General Counsel
Terex Corporation
200 Nyala Farm Road
Westport, Connecticut  06880

Re:   **Pre-Suit Notice of Non-Conformance and Demand for Relief –**
**Terex Hi-Ranger XT Series Overhead Aerial Devices**

Dear Mr. Cohen,

We have been retained by Ace Tree Surgery, Inc. ("Ace") to investigate alleged defects in the design of all Terex Hi-Ranger XT Series Overcenter Aerial Devices ("Hi-Ranger XTs") and any potential claims that may be asserted by Ace individually and as a representative of a proposed class of all other owners and lessees of vehicles equipped with Hi-Ranger XTs.  We have recently completed our initial investigation and hereby provide notice to you that **all** Hi-Ranger XTs:

(1) suffer from a common design defect that causes them to fail to provide the ANSI and OSHA required 2:1 structural safety factor at several critical high stress concentration areas along the length of the upper and lower booms;

(2) fail to conform to Terex's explicit representations and warranties of ANSI A92.2 conformance;

(3) fail to conform to Terex's explicit lifetime parts only warranty for structural members, including steel and fiberglass booms;

(4) fail to conform to the implied warranty of merchantability and fitness for a particular purpose;

(5) are being and have been deceptively marketed and sold by Terex (either directly, through subsidiaries, or through authorized agents) in violation of state unfair and deceptive trade practices acts statutes, including, but not limited to, the Connecticut Unfair Trade Practices Act, Con. Gen. Stat. §§ 42-110a, *et seq.*, and;

(6) are unreasonably dangerous and unsuitable for their intended uses.

Specifically, all Hi-Ranger XTs fail to adhere to the standard for aerial devices promulgated by the American National Standards Institute as "ANSI A92.2 American National Standard for Vehicle Mounted Elevating and Rotating Work Platforms," ("ANSI A92.2"), which has in turn been adopted by the Occupational Safety and Health Administration ("OSHA") as a binding regulation.  *See* 29 C.F.R. § 1910.67(b) and 29 C.F.R. § 1926.453; see also 29 C.F.R. 1910.6.  The ANSI A92.2 standard, at section 4 "Design Requirements" subsection 4.2 "Structural Safety Factors," requires that the steel structural elements of an aerial device have a calculated design stress that ***is not*** more than 50% of the minimum yield strength of the steel.  However, the calculated design stress in Hi-Ranger XTs ***is*** more than 50% of the minimum yield strength of the steel specified by Terex in several critical areas of the upper and lower booms circled in red and blue in the diagram below ("the Defect"):



The Defect is both a serious safety issue and constitutes a breach of Terex's certification of ANSI A92.2 testing, inspection, and conformance.  Because the Defect renders the Hi-Ranger XTs non-compliant with ANSI A92.2, and because OSHA requires all aerial devices to be compliant with ANSI A92.2 in order for them to be legally used by workers, the Defect renders all Hi-Ranger XTs economically worthless to their owners and lessees who can no longer legally use them in their businesses.

Ace, and all other owners or lessees of Hi-Ranger XTs, would not have been able to discover the Defect independently without costly testing and examination of the design of Hi-Ranger XTs. Indeed, our investigation has revealed that Terex actually knew of the Hi-Ranger XTs' ANSI A92.2 § 4.2 non-conformance at least as of January 2004 following strain gauge

testing by All Test & Inspection, Inc. Although Terex knew of the Defect as of 2004, Terex has concealed the Defect from Ace and all other owners and lessees of Hi-Ranger XTs; the All Test & Inspection, Inc. test results appear to have only been recently revealed following the submission of a timeliness query to the National Highway Traffic Safety Administration by The Cooper Firm on May 14, 2005.

On behalf of Ace, and all other owners or lessees of Hi-Ranger XTs, we hereby demand that Terex:

(1) Notify all owners or lessees of Hi-Ranger XTs of the Defect;

(2) Initiate a recall of all Hi-Ranger XTs because of the Defect;

(3) Cease and desist further marketing and sales of Hi-Ranger XTs;

(4) Confirm that Terex's new Hi-Ranger XT Pro line of overhead aerial devices actually meets ANSI and OSHA standards, particularly the subsection 4.2 calculated structural safety factor of 2:1 by producing all relevant calculations for confidential review;

(5) Economically compensate all owners or lessees of Hi-Ranger XTs for any and all losses of value in their Hi-Ranger XTs;

(6) Economically compensate all owners and lessees of Hi-Ranger XTs for any and all costs incurred in replacing their Hi-Ranger XTs with aerial devices that actually meet ANSI and OSHA standards;

(7) Economically compensate all owners and lessees of Hi-Ranger XTs for any and all consequential damages arising from loss of use of their Hi-Ranger XTs until those Hi-Ranger XTs are replaced or brought into conformance with ANSI A92.2 § 4.2 through an acceptable engineering solution, if any such solution is in fact achievable;

(8) Honor its lifetime parts only warranty and certification of ANSI A92.2 conformance by providing all owners and lessees of Hi-Ranger XTs with upper and lower booms that actually conform with the ANSI A92.2 § 4.2 structural safety factor of 2:1;

(9) Pay Ace's reasonable attorneys' fees and expenses incurred in this investigation.

We are prepared to meet and confer with you on these demands made on behalf of Ace and all other similarly situated owners and lessees of Hi-Ranger XTs in person in Chicago, or by video teleconference, on July 21, 2015 at any time upon which we can mutually agree. Declination of our offer to meet and confer, and to accede to the reasonable demands outlined above, will be interpreted as a rejection of all such demands. Should Terex reject these demands, we intend to file a class action complaint against Terex for breach of warranty, for violation of state unfair trade practices acts, and for any other related claims in law and equity.

Should you wish to confer on any matter raised in this letter prior to July 21, 2015, please feel free to contact me at your convenience.

Sincerely,

Adam J. Levitt

CC:    Ronald M. DeFeo, Terex Corporation, Chairman and Chief Executive Officer

# Exhibit D



FAX                                        Page 1 of 2

July 21, 2015

To:  Adam Levitt          Fax Number:  312-214-0001

From:    Eric Cohen

Subject:  Attached letter

If you encounter transmission problems, please call (203) 222-5994
and ask for Barbara



Eric I Cohen
Senior Vice President, Secretary
and General Counsel
Telephone:      (203) 222-5950
Facsimile:       (203) 227-1647
E-mail:      eric.cohen@terex.com

July 21, 2015

Mr. Adam J. Levitt
Director
Grant & Eisenhofer P.A.
30 N. LaSalle Street
Suite 1200
Chicago, IL 60602

Dear Mr. Levitt,

I am writing in response to your July 10, 2015 Pre-Suit Notice of Non-Conformance and Demand for Relief –Terex Hi-Ranger XT Series Overhead Aerial Devices.

At the outset, we wish to clarify that the manufacturer of the Terex XT Aerial Devices is Terex South Dakota, Inc. ("Terex SD") f/k/a Terex-Telelect, Inc., a subsidiary of Terex Corporation. Turning to the assertions in your Pre-Suit Notice, Terex Corporation, on behalf of itself and Terex SD, hereby rejects all assertions and demands set forth in your Pre-Suit Notice.

By your Pre-Suit Notice, you have alleged that the XT Aerial Device line does not conform to ANSI A92.2. To the contrary, Terex SD maintains that the XT line is ANSI compliant. Given your serious allegations, we would expect you have specific and detailed expert evidence in this regard, and request that you provide us with any written reports which substantiate the allegation of noncompliance. This type of disclosure will allow Terex SD to examine and analyze your allegations.

Only after you have provided the requested expert report(s) can Terex SD consider whether your request to meet and confer to discuss the claims would be productive. That meeting can take place at a designated location in Connecticut, or if more convenient for you, at a location in New York City. Alternatively, we could conduct a video conference. The earliest in which we could conduct such a meeting would be the week of August 3 – 7, 2015 provided we receive the requested report at least one week prior to the date set for the meeting.

Very truly yours,

Eric I Cohen

